UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT J. WINTERHALTER,

   Plaintiff,         Case No.  1:10-CV-385

v.               HON. GORDON J. QUIST

DYKHUIS FARMS, INC.,

   Defendant.
              /

**OPINION**

   Plaintiff, Robert J. Winterhalter, filed this action against his former employer, Dykhuis Farms, Inc. ("DFI"), under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, alleging that DFI interfered with his rights under the FMLA and retaliated against him for taking medical leave.  DFI has filed a motion for summary judgment asserting that Winterhalter was terminated as part of company-wide reduction-in-force ("RIF") that was compelled by dire economic conditions, not because he took FMLA leave.  For the reasons set forth below, the motion will be granted.

**I. Background**

   DFI is a family-owned pork-producing business, which is headquartered in Holland, Michigan, but which maintains a number of facilities located in other Michigan cities and Indiana. In February of 2007, DFI hired Winterhalter to work as Unit Manager for its Grandparent Herd with an annual salary of $55,000.00. (Winterhalter Dep. Ex 1., Ehinger Dep. at 10.) The Grandparent Herd is of particular importance to DFI's operations because it produces specific genetic lines of "parent" sows that are used to repopulate the company's commercial units as pigs are sold at market.

(Ehinger Decl. ¶2.)  At the time Winterhalter was hired, the Grandparent Herd was split between four separate farms: Rachel's Farm, Joe's Farm, Cliff's Farm, and Maple Corner.  (J. Dykhuis Decl. ¶ 3.)  As Unit Manager for the Grandparent Herd, Winterhalter reported directly to Erin Ehinger, who was responsible for managing all sow units.  (Winterhalter Dep. at 37, Ehinger Decl. ¶ 1.)

In February of 2008, Winterhalter received a performance evaluation for the previous year. (Winterhalter Dep. Ex. 3.)  The evaluation form reviewed Winterhalter's performance in six areas and provided four scoring possibilities for each: (1) Outstanding; (2) Above Standards; (3) Meets Standards; or (4) Area to Improve/Unacceptable.  (*Id.*)  Winterhalter did not receive an "Outstanding" score in any of the six areas.  He received only one "Above Standards" score, which was in the area of attendance and dependability.  He received two "Meets Standards" scores – for productivity and job knowledge.  With regard to productivity, the form indicates that Winterhalter and his crew were efficient, but that they needed to improve production numbers in 2008.  As to the three remaining areas, Winterhalter received a score of "Area to Improve/Unacceptable" either on its own, for support of company policies and goals and cooperation, or in conjunction with "Meets Standards," for quality of work.  With regard to these three areas, the evaluation form indicates that Winterhalter did not always live out DFI's five character traits, sometimes had a bad attitude and difficulty cooperating with others, sometimes turned in paperwork that was late or incomplete, and spent most of his time at Rachel's Farm instead of spreading his time at all Grandparent Herd locations.  (*Id.*)

Winterhalter received a verbal warning in May of 2008 regarding his failure to timely review DFI's five character traits with his crew despite several reminders to do so. (Winterhalter Dep. Ex. 4.)  His employment notes also indicate that he was "notoriously bad at filling out and turning in paperwork," was still spending too much time at Rachel's Farm as of March 2008, and did not have

DFI's mission memorized for an April 2008 production meeting. (Ehinger Decl. Ex. A.)  In February of 2009, DFI hired veterinary consultants to review DFI's herds and operations, while paying particular attention to the Grandparent Herd because its overall performance had been declining.  The report indicates several areas of concern relating to the Grandparent Herd, many of which were within Winterhalter's responsibilities.  (Ehinger Decl. ¶¶ 7-8, 11, and Ex. B.)[1]

In March of 2009, Winterhalter was transferred from his position as Unit Manager of the Grandparent Herd to Unit Manager of Shamrock Farm, which was being converted from a finisher unit to a gilt development farm.[2]  According to Ehinger and Brandon Hill, DFI's Finishing Production Manager, Winterhalter was transferred because, although he "was in over his head at the Grandparent Herd," his experience there made him better suited to manage Shamrock than either of the two employees currently staffed there – Dan Dalman and Tim Hocthanner, neither of whom had any experience with gilt development operations.  (Ehringer Dep. at 32, Hill Decl. ¶ 6.)  Winterhalter testified that he was told that he was being transferred because the person that was in charge at Shamrock was not doing his job. (Winterhalter Dep. at 52.)

At Shamrock, Winterhalter reported directly to Hill.  (Hill Decl. ¶ 4.)  Winterhalter started at Shamrock on March 23, 2009.  (*Id.*)  Beginning April 7, 2009, Hill documented a number of problems with Winterhalter's performance.   Among other things, these problems included failure to properly document barn inventories, several violations of bio-security rules,[3] and late vaccinations.  (Hill Decl. Ex. A.)

---

[1] These areas of concern included scours (diarrhea), wean age, PRRS (a virus that can cause reproductive failure in breeding stock and respiratory tract illness in piglets), and conception/farrowing rates.  (Ehinger Decl. ¶¶ 8, 11.)

[2] A gilt is a female piglet that is weaned from its mother but has not yet been impregnated. (Ehinger Decl. ¶ 3.)

[3] Bio-security rules are rules put in place to prevent the transfer of diseases such as scours and PRRS among the herds.  (Hill Decl. ¶ 4.)

On May 1, 2009, Winterhalter suffered an injury to his right rotator cuff when he slipped and fell in one of the barns. He continued to work, however, until October 12, 2009, when he took a leave of absence to undergo surgery to repair the injury. (Winterhalter Dep. at 83-85.) Dean Dozeman, who is responsible for coordinating DFI's human resource functions, approved the leave. (Dozeman Dep. at 40.) Winterhalter was originally scheduled to return to work on December 14, 2009, but his doctor delayed his return until January 4, 2010. (*Id.* at 48.) On December 31, 2009, Dozeman called Winterhalter and asked him to come in. Dozeman told Winterhalter that it was because he needed to pick up a return-to-work authorization form, when, in reality, it had already been decided that Winterhalter would be terminated. (*Id.* at 52-53.) When Winterhalter arrived on January 4, 2010, he was given a termination letter which read in pertinent part:

> Dear Robert,
>
> It is encouraging that you have improved enough to come back to work, however, over the past few months, Dykhuis Farms Inc has been downsizing its herd. Unfortunately, this has eliminated your position as Manager of the Shamrock Unit.
>
> We are still facing financial and economic hardships in operations, so the primary reason for this job termination is for financial reasons. The secondary reasons are based on job performance. As you are aware, you have received verbal warnings from both Brandon and Erin over the past two and a half years. This is the second reason you have been terminated from Dykhuis Farms Inc.

(Pl.'s Reply Ex. 11.)

DFI asserts that Winterhalter was laid off as part of an overall reduction in force that was compelled by dire economic conditions. Due to low hog prices and high overhead and input costs, DFI's equity-to-asset ratio had plummeted between 2006 and 2009. (J. Dykhuis Decl. ¶ 6.) Moreover, the company was operating on a line of credit that was scheduled to terminate at the end of 2009. In the summer of 2009, DFI's bank hired a financial and accounting consultant to assess DFI's projections, business practices and company structure, after which the bank demanded that

DFI take immediate and drastic measures to improve its financial performance, including reducing the size of its operations and overhead. (*Id.* ¶¶ 7-8.)

Therefore, beginning in July of 2009, DFI began an operational and economic reduction strategy. This included strategically timed herd reductions, affecting both the Grandparent Herd, which was reduced by 28% between September and November 2009, and the Shamrock Unit, which was reduced by 27% between September 21, 2009 and January 4, 2010. (*Id.* ¶¶ 11-17.) In addition, Robert and Lorrie Dykhuis sold personal assets to provide additional operating capital. (*Id.* ¶ 10.)

In order to achieve the maximum financial benefit from the herd reductions, DFI also implemented a plan to reduce the size of its work force. The plan was to, first, determine which units or departments could be reduced based on the reduced herd size, and second, select individuals for reduction based on performance. (*Id.* ¶¶ 18-19.) Between September 2009 and March 2010, a total of thirteen employees were laid off. (*Id.* Ex. A.)[4] Within that same time frame, at least six new employees were hired. (Pl.'s Reply Ex. 14.) However, five of the six new hires were part-time seasonal or weekend employees, and the sixth, although full-time, replaced a departing full-time employee. (*Id.*) In November of 2009, the price of hogs began to rise again. (R. Dykhuis Dep. at 19-20). By late spring 2010, hog prices had doubled from where they were the previous summer and DFI had once again turned profitable. (*Id.*)

During the RIF, it was determined that the Shamrock unit was to be reduced by one employee. As Finishing Production Manager and Supervisor for Shamrock, Hill made the ultimate decision of which of the three employees staffed there to terminate. He testified that in so doing, he considered job performance and salary costs. Of the three employees at Shamrock, Winterhalter

---

[4] The layoffs took place as follows: two people were terminated in September 2009, two in October, one in December, four in January, and the last in March 2010. *Id.*

had the lowest overall job performance and was the highest paid. (Hill Decl. ¶¶ 7-10.) Hill testified that he did not consider Winterhalter's FMLA leave in making the decision. (*Id.* ¶ 11.)

Although DFI alleges that it was Hill who made the ultimate decision to terminate Winterhalter over the other two Shamrock employees, it appears that Hill, Dozeman, Ehinger, and Robert Dykhuis all discussed the issue at some point. Two emails are of particular relevance in this regard. The first, dated December 1, 2009, was sent by Dozeman to Robert Dykhuis. Attached to the email was a Medical Impairment Statement form from Winterhalter's doctor indicating that he would be disabled between October 12, 2009 (the date of the surgery) through December 13, 2009. The email reads as follows:

> Hi Bob,
>
> This documentation requires Bob W. to be completely off work. I will contact Hastings Mutual to see if this can be adjusted depending on what type of work we can find for him.
>
> Additionally, are we still going to consider laying him off due to lack of work at Shamrock and the rest of the farm? If so, would we consider rehiring him as a unit manager or even as a team leader, if at all?
>
> Thanks,
> Dean

(Pl.'s Surreply Ex. 16.)

The second email, dated December 24, 2009, was sent by Dozeman to Hill, and reads as follows:

> Hi Brandon,
> Are you around next week, I would like to meet with you regarding Bob W. I am wondering about your thoughts regarding a possible lay-off for him. I talked with Bob Dykhuis, and he felt it would be good unless Dan and Tim weren't getting stuff done. I did ask Jason how things were going and he said Dan and Tim were doing great. Bob Winterhalter is supposed to come back January 4th from Work Comp.

(Pl.'s Reply Ex. 10.) Hill replied, "Sounds good, I initiated the conversation with Bob D. this week and I will have time to sit down with you next week." (*Id.*)

6

Finally, on January 18, 2010, two weeks after Winterhalter's termination, DFI internally posted for a new position, which paid $12.00 per hour – Finisher Barn Manager. (Dozeman Dep. at 57, Hill Dep. 56-57.) The position was filled in May of 2010. (Dozeman Dep. at 57.) Winterhalter was never notified of the new position, because, according to DFI, he was no longer employed when the position became available and because he was not qualified. (Hill Dep. at 54-55.)

## II. Motion Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. Discussion

The FMLA provides two types of claims or theories of liability. *See Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir.2004); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir.2003). The first theory is the "entitlement" or "interference" theory, which is based upon the substantive rights created by the FMLA. *Arban*, 345 F.3d at 401. An employer is liable under this theory if it interferes with an employee's FMLA-created right to medical leave or to reinstatement

7

following the leave. 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title."). The second type of FMLA claim is a "retaliation" or "discrimination" theory, which arises under 29 U.S.C. § 2615(a)(2). That provision states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title." *See also* 29 C.F.R. § 825.220(c) (prohibiting employers from "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions"). Winterhalter asserts both types of claims.

### A.  Interference Claim

To prevail on an interference claim, the plaintiff must prove the following: (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave the defendant notice of his intention to take leave; and (5) the defendant denied him FMLA benefits to which he was entitled. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).  The only element at issue here is the last: whether Winterhalter was denied an FMLA benefit to which he was entitled.  Winterhalter asserts that he was denied his right to reinstatement.  DFI asserts that he had no right to reinstatement because he was terminated for reasons wholly unrelated to his FMLA leave – namely, the RIF.

Although the FMLA creates a statutory right to reinstatement, *see* 29 U.S.C. § 2614(a)(1), that right is not an absolute one: "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar*, 443 F.3d at 508.  In other words, "[a]n employer need not reinstate an employee who would have lost his job even if he had not taken FMLA leave." *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407-08 (6th Cir. 2003); *see also Arban*, 345 F.3d

8

at 401; 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.").

Generally, the employee bears the burden of establishing, by a preponderance of the evidence, that he is entitled to the benefit he claims. *Arban*, 345 F.3d at 401. Where, as here, the benefit denied is reinstatement and the employer claims that the employee would have been discharged even if he had not taken leave, the regulations place the burden of proof on the employer. *See* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment."). The Sixth Circuit has not directly addressed which party bears the burden of proof under these circumstances. The majority of circuits that have considered the issue, however, agree that the regulation validly shifts the burden of proof to the employer. *See Sanders v. City of Newport*, __ F.3d __, 2011 WL 905998, at *7 (9th Cir. Mar. 17, 2011); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 963 (10th Cir. 2002); *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 978-79 (8th Cir. 2005); *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1208 and n.11 (11th Cir. 2001). Thus, the Court will require DFI to bear the burden of proving that Winterhalter would have been discharged even if he had not taken FMLA leave.

DFI has presented considerable evidence that Winterhalter was fired as part of a RIF and without regard to his having taken FMLA leave. Like the other DFI units, the Shamrock Unit underwent a reduction in herd size between September 2009 and January 2010. Because of the reduced herd size, it was determined that one of the three Shamrock employees was to be terminated, and of the three employees there, Winterhalter was the highest paid and the worst

performing. Hill also testified that he did not consider Winterhalter's leave status when making the decision.

Winterhalter asserts that there is a genuine issue of material fact as to whether he would have been terminated had he not taken leave. First, he notes that DFI was aware of his alleged performance deficiencies well before he took leave, and yet waited until after he took leave to terminate him. This timing, he asserts, casts doubt on whether he would have been fired had he not taken leave. In support, Winterhalter cites *Arban v. West Publishing Corp.*, 345 F.3d 390 (6th Cir. 2003), and *Moorer v. Baptist Memorial Health System*, 398 F.3d 469 (6th Cir. 2005). In both *Arban* and *Moorer*, the courts explained that the timing of a termination decision can cast doubt on an employer's purported reasons where the employer was aware of the alleged problems before, but waited until the employee took leave to terminate. *See Arban*, 345 F.3d at 402; *Moorer*, 398 F.3d at 489-90.

The timing of Winterhalter's performance deficiencies as compared to the time he was discharged, however, is not the only relevant "timing" here. The other timing that is important is the timing of DFI's financial crisis and the resultant RIF. Unlike the plaintiffs in *Arban* and *Moorer*, Winterhalter was not terminated simply based upon performance deficiencies of which his employer was aware prior to his leave; instead, he was terminated as part of an overall RIF that happened to use performance records as an objective criteria for selecting employees for termination. The timing of the RIF, and specifically, the reduction in herd size at Shamrock, coincided with the timing of Winterhalter's termination. Under these circumstances, the fact that the employer was aware of the performance deficiencies in advance does not cast doubt on whether the employee would have been fired had he not taken leave.

Next, Winterhalter asserts that both December emails support an inference that DFI considered his leave status in making the decision to terminate. The Court rejects this contention outright as to the December 1st email because, although it mentions both Winterhalter's leave status and his possible lay off, it in no way links the two nor does it place Winterhalter's leave status in a negative light. Winthalter's argument as to the December 24th email – in which Robert Dykhuis stated that a lay off would be good so long as the other Shamrock employees were "getting stuff done" – warrants further discussion.

Winterhalter relies primarily on *Parker v. Hanhemann University Hospital*, 234 F. Supp. 2d 478 (D.N.J. 2002), and *Stephens v. Neighborhood Service Organization*, No. 07-11908, 2008 WL 3913926, at *5 (E.D. Mich. Aug. 19, 2008), neither of which involved company-wide RIFs, as here, but rather elimination of the plaintiff's position only. In each case, the evidence indicated that the employer learned that it was able to function effectively without the employee while the employee was on leave and, therefore, decided to eliminate the employee's position. *Parker*, 234 F. Supp. 2d at 490; *Stephens,* 2008 WL 3913926, at *5. Thus, both courts found that a reasonable factfinder could conclude that had the plaintiff not taken leave, he would not have been terminated. *Parker*, 234 F. Supp. 2d at 490; *Stephens*, 2008 WL 3913926, at *5.

Winterhalter asserts that Mr. Dykhuis' statement in the December 24th email supports an inference that, like the *Parker* and *Stephens* employers, DFI considered how Shamrock was functioning without him in deciding to eliminate his position and that had he not taken leave, he would not have been discharged. However, such a conclusion ignores the fact that between September 2009 and January 2010, Shamrock was undergoing a strategically-timed herd reduction. As the herd size grew smaller, DFI was considering whether that reduced herd size also warranted a reduction in staff. At best, the email supports an inference that Winterhalter's absence made

11

DFI's decision that much easier because it reinforced that, indeed, two employees were sufficient to run Shamrock in its reduced capacity. It does not follow, however, that Winterhalter's leave played a role in Hill's ultimate decision to select him over the other two Shamrock employees. "The FMLA does not give the employee on protected leave a bumping right over employees not on leave." *Taylor v. Union Inst.*, 30 F. App'x 443, 452-53 (6th Cir. 2002).

Moreover, lay off discussions were already well underway when Mr. Dykhuis sent the December 24th email. This is evident from the December 1st email, which, significantly, makes no mention of whether Shamrock was getting by without Winterhalter, but instead references "lack of work at Shamrock and the rest of the farm" as the rationale for the lay off. Thus, contrary to Winterhalter's assertion, there is no evidence that layoff discussions took place simply because DFI learned, while Winterhalter was on leave, that Shamrock could function without him.

At oral argument Winterhalter's counsel also cited, *Cutcher v. Kmart Corp.*, 364 F. App'x 183 (6th Cir. 2010), which is more analogous in that it did involve a company-wide RIF, but which is nonetheless distinguishable. In order to select employees for termination, the employer in *Cutcher* completed an Associate Performance Recap Form for each employee, which evaluated the employee in several categories. *Id.* at 186-87. The form included a comments section to be completed if there was any significant change in an employee's RIF rating as compared to the employee's annual appraisals. *Id.* at 187. The plaintiff's RIF score was lower than her most recent appraisal and written in the comment section of her RIF form was "LOA" – meaning leave of absence. *Id.* Although the person who completed the form indicated that he included "LOA" simply as a reminder that the plaintiff had to be terminated at a different time than other impacted employees, he also admitted that he knew the comment section was meant for explaining any difference between the RIF score and the most recent annual appraisal. *Id.* Construing the facts in

the light most favorable to the plaintiff, the court concluded that a material question of fact existed as to whether "LOA" was listed as a reason for the plaintiff's low score. *Id.* at 189. No such evidence exists here. Hill, who made the final decision to terminate Winterhalter over the other two Shamrock employees, cited only his poor performance record and salary in making his decision. There is no documentation akin to that in *Cutcher* indicating that Hill took into account Winterhalter's leave status.

In addition to the foregoing, Winterhalter points to a few other facts that he asserts support his interference claim. The first is Dozeman's deposition testimony in which he stated that, had Winterhalter returned on December 14, 2009, as originally scheduled, he would have gotten his job back. That fact is not in dispute, however, as the December 24th email demonstrates that a final decision to terminate had not been made even by that date. The second is that, of all the employees laid off during the RIF, Winterhalter was the only unit manager. Yet, Winterhalter does not explain why that is significant or casts doubt on whether his termination was legitimately part of the RIF and not linked to his leave. *See Grindstaff v. Sun Chem. Corp.*, 1:09-cv-450, 2010 WL 4878953, at *6, 16 (S.D. Ohio Nov. 22, 2010) (granting summary judgment in favor of the employer on both the plaintiff's interference and retaliation claims even though the plaintiff was the only production supervisor laid off during the RIF). The third is that a new management position was posted within two weeks after Winterhalter was terminated. Yet, Winterhalter does not assert that the position was actually a replacement for his job, and to this date, Dalman and Hocthanner are still the only two employees at Shamrock. *See Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1995) (explaining that an employee has not been terminated as part of a RIF if he is replaced after his discharge, but that a person is not "replaced" simply because "another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among

other existing employees already performing related work"; rather, "[a] person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties"). Finally, Winterhalter asserts that the financial crisis that led to the RIF had already abated before the termination decision was made. The evidence does not support this conclusion, however. Although hog prices began to rise in November of 2009, there is no evidence that DFI was operating at a profit by January 4, 2010, when Winterhalter was terminated.

Therefore, the Court concludes that DFI is entitled to summary judgment on Winterhalter's interference claim as no genuine of material fact exists as to whether Winterhalter would have been terminated had he not taken leave.

**B. Retaliation Claim**

To establish a prima facie case of retaliation under the FMLA, the plaintiff must demonstrate that: (1) he was engaged in a protected activity; (2) the employer knew that he was exercising his rights under the FMLA; (3) the employer took an adverse employment action against him after learning of that he was exercising his rights under the FMLA; (4) there was a causal connection between the protected activity and the adverse employment action. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555-56 (6th Cir. 2006). If the plaintiff makes this prima facie showing, the burden shifts to the defendant to demonstrate evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's stated reason is pretextual. *Id.*

The parties do not dispute that Winterhalter availed himself of a protected right under the FMLA by taking leave and that he suffered an adverse employment action when he was terminated. DFI argues that Winterhalter failed to satisfy the third element of his prima facie case because he

14

has not produced evidence of a causal link between his FMLA leave and the adverse employment action. Where, as here, the employee was discharged on the very day he returned from FMLA leave, the temporal proximity is "unduly suggestive" and, therefore, sufficient to make a prima facie showing of discrimination. *Mastin v. Sysco Food Servs. Inc.*, No. 08-13369, 2010 WL 1139335, at *6 (E.D. Mich. Mar. 24, 2010); *see also Bell v. Prefix, Inc.*, 321 F. App'x 423, 426-27, 430 (6th Cir. 2009) (finding close temporal proximity sufficient to show a causal connection at the prima facie case inquiry, but noting that such evidence standing alone is insufficient to establish that the employer's legitimate, non-discriminatory reason was pretextual) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)); *Heady v. United States Enrichment Corp.*, 146 F. App'x 766, 770 (6th Cir. 2005) (same).

Because Winterhalter has established a prima facie case of discrimination, the burden now shifts to DFI to articulate a legitimate, non-discriminatory basis for Winterhalter's termination. DFI has presented evidence regarding its RIF – including that Shamrock's herd had been reduced by 27%, effectuating the need to reduce that farm by one employee, and Hill's determination that Winterhalter was the lowest performing of the three employees at that location and the highest paid. Therefore, DFI has set forth a legitimate, non-discriminatory basis for Winterhalter's termination. *See Heady*, 146 F. App'x at 770 (finding that the employer had met its burden by producing evidence regarding a RIF plan and the company's determination that the plaintiff was the lowest-rated manager); *see also Bell*, 321 F. App'x at 428 n.1 (explaining that "RIFs are legitimate, nondiscriminatory reasons for adverse employment decisions").

Therefore, the burden shifts back to Winterhalter to create a genuine issue of material fact regarding the truth of DFI's proffered reason for his discharge. Winterhalter may establish that DFI's proffered reason is pretextual by showing "that the reasons given have no basis in fact, did not motivate the discharge, or were insufficient to warrant discharge." *Heady*, 146 F. App'x at 770.

In addition to the evidence presented in relation to the interference claim, which the Court has already rejected, Winterhalter points to the following as evidence of pretext: that he was terminated on the day he was scheduled to return from his FMLA leave; that Dozeman deliberately misled him into believing that he was coming in for a return to work slip when, in reality, DFI had already made the decision to terminate; that Hill first began keeping notes regarding Winterhalter's performance on the day he suffered a work-related injury; that DFI violated FMLA regulations by not giving Winterhalter notice of his FMLA rights; and finally, that the alleged RIF was informal and unstructured. The Court will address each in turn, beginning with the last, which essentially challenges the formality of the RIF and the point to which the majority of the parties' briefing is dedicated.

Winterhalter principally relies on *Bell v. Prefix, Inc.*, 321 F. App'x 423 (6th Cir. 2009), to support that DFI is not entitled to summary judgment. In *Bell*, the Sixth Circuit reversed the district court's grant of summary judgment in favor of the employer on the plaintiff's FMLA retaliation claim. *Id.* at 424. Noting that it was a "close question," the court found that a reasonable jury could conclude, based on the collective strength of the following evidence, that the employer's proffered rationale – that the plaintiff was terminated as part of a RIF – was pretextual. *Id.* at 430-31. First, the decision-maker had accused the plaintiff of "abandoning" the company and remarked that "'everyone' needed to work more hours," both of which suggest hostility towards the plaintiff for taking leave. *Id.* at 430. Second, although the employer had cited the plaintiff's slow work habits and lackadaisical attitude in its decision to terminate, the statements were contradicted by positive performance records and evaluations. *Id.* Third, the temporal proximity between his leave and termination, although insufficient standing alone, "is a strong indicator of pretext when accompanied by some other, independent evidence." *Id.* at 431. And finally, there was no formal structure to the RIF nor was any objective criteria used in selecting employees for termination. *Id.* Instead, the

16

court explained, the decision-maker appeared to fire "whomever he liked whenever he liked," which supported a finding of pretext in that the discretionary nature of the terminations allowed for discriminatory intent to influence his decisions. *Id.*

In contrast to *Bell*, the Sixth Circuit affirmed the district court's grant of summary judgment in favor of the employer in *Heady v. United States Enrichment Corp.*, 146 F. App'x 766 (6th Cir. 2005). In *Heady*, the employer had instituted a broad RIF plan in response to budgetary restraints. *Id.* at 768. It was determined that one of the three office managers in the Operations division was to be eliminated. To select which manager to terminate, three supervisors met, discussed, and evaluated the managers in a number of areas, called "competencies." *Id.* at 768-69. Because the plaintiff was the lowest-rated of the three managers, she was terminated. The Sixth Circuit found that the plaintiff had failed to provide evidence to create a genuine issue of fact as to whether the RIF was pretextual. The court noted that she had not shown that she was more qualified than the other managers. Rather, she had attempted to challenge the process by which she was evaluated. For example, she argued that the three evaluators could not support their low ratings with specific facts. The court rejected this argument, citing deposition testimony including that she was not a "true team player," "did not relate well to people," and had difficulty ordering supplies in a timely manner, etc. The plaintiff also argued that the reasons articulated by the employer were not rational from a business perspective. The court rejected this argument, explaining that the question was not whether she was qualified for the position, but whether she was the lowest rated of the office managers. In the context of a RIF, the court explained, the articulated reasons – failure to submit reports and purchase supplies in a timely manner, inability to relate well to people, etc. – justified her termination. *Id.* at 771-72.

Contrary to Winterhalter's assertion, the circumstances presented here are more akin to *Heady* than to *Bell*. The *Bell* court noted that it was a "close question," and yet none of the pieces

17

of evidence cited there in support of pretext are present in this case. Unlike *Bell*, where the terminations were made on a completely discretionary and ad hoc basis, DFI articulated objective reasons for selecting which Shamrock employee to terminate – performance records and salary. There have been no negative statements by DFI employees suggesting hostility towards Winterhalter's leave. Unlike *Bell*, Winterhalter's performance records support the claimed performance deficiencies rather than contradict them. And finally, although Winterhalter was fired on the day he was scheduled to return to work, the timing of the termination is also entirely consistent with the reduction in herd size at Shamrock, which was not complete until January.

The other evidence Winterhalter cites in support of pretext is insufficient to create a genuine issue of material fact. Winterhalter notes that Dozeman deliberately misled him into believing that he was coming in for a return-to-work slip when, in reality, it had already been decided that he would be terminated. Winterhalter cites *Wilkerson v. Autozone, Inc.*, 152 F. App'x 444 (6th Cir. 2005) and states that the court "considered" similar evidence in upholding a verdict for an FMLA plaintiff. Although the fact section of the opinion references that the employer told the plaintiff she needed a doctor's note to return to work, when in reality they had already decided to fire her, the court makes no mention of this fact in its analysis nor gives any indication that it was relevant to pretext. *See id.* at 447-51. Winterhalter's assertion that Hill started keeping notes on Winterhalter's performance on the day he suffered a work-related injury is contrary to the record. A review of the notes demonstrates that Hill began documenting Winterhalter's performance deficiencies nearly a month before Winterhalter's May 1, 2009, injury. Indeed, there are three separate entries in Hill's notes during the month of April. (Hill. Dep. Ex. A.) Finally, Winterhalter also complains that DFI failed to provide him "eligibility notice" and "rights and responsibilities notice" as required by the FMLA regulations. *See* 29 C.F.R. §§ 300(b) and (c). Yet, he does not explain how this technical violation of the FMLA supports a finding of pretext nor does he assert that it caused him any

prejudice or harm. *See Verdake v. United States Postal Serv.*, 378 F. App'x 567, 575 (6th Cir. 2010) (explaining that a technical violation of the FMLA is not actionable unless the employee suffers some prejudice or harm as a result).

Therefore, the Court finds that DFI is also entitled to summary judgment on Winterhalter's retaliation claim as there is no genuine issue of material fact as to whether DFI discriminated against him in violation of the FMLA.

## CONCLUSION

For the foregoing reasons, DFI's motion for summary judgment will be granted.

A separate order will issue.

Dated:  May 31, 2011                                  /s/ Gordon J. Quist
                                                                    GORDON J. QUIST
                                                            UNITED STATES DISTRICT JUDGE